Today is number 21-10159, Lisa Reed v. Pediatric Services of America. Lisa Reed v. Pediatric Services of America. Is Ms. Reed here? Yes. Okay. You may come up and make your argument, Ms. Reed. Welcome to the court. And I understand that you would like to speak for five minutes and reserve five minutes for your rebuttal. Is that correct? Okay. Okay. May I please the court? My name is Lisa A. Reed, the appellant in this case of Lisa A. Reed v. Pediatric Services of America. Your Honors, the plaintiff respectively requested this court to review this case to reverse and remand the district court decision for several reasons. In Order 47, Judge Johnson erred when he stated the court reviewed both parties' briefs, the deposition transcript, and the other exhibits submitted by both parties. The court finds no credence in plaintiff's assertions and declines to find the transcript of her deposition to be inadmissible. Judge Johnson never heard the recorded brief deposition, sorry, nor has a non-biased member of the court. Thus, he could not possibly determine the validity of the written report without having heard the audio deposition. The falsified deposition was relevant to the outcome of the case. The defense produced the witness claiming to have personal knowledge of the deposition tape. When Judge Johnson accepted the witness's statement as truth over the plaintiff's sworn testimony, he also denied the plaintiff's cross-examination to impair witness credibility. When a witness has harmed a case, cross-examination is necessary, especially when said witness is the only source for the evidence. When Judge Johnson denied the plaintiff an evidentiary hearing, he gave no instruction regarding preservation. Because the plaintiff is untrained in the law and she was not aware of the preservation rule, she assumed she could address the motion at trial. Judge Johnson held the plaintiff to the same standard of compliance with procedural rules as a litigant would counsel. Justices know that most pro se litigants would more than likely have difficulty complying with all the rules, simply through ignorance of the law. Plaintiff continued to object to the falsified deposition and in Order 71, Judge Murphy addressed the plaintiff's objections. And because Judge Murphy recognized her objections, plaintiff in fact feels that her objections were recognized by the court and therefore met the preservation rule. As a pro se litigant who only wants a right to due process, some leniency is required to preserve a litigant's meaningful opportunity to be heard. Plaintiff would also like to address the defense summary judgment. In order to succeed, the movement must show that there is no genuine dispute as to any material fact and that the movement is entitled to judgment as a matter of law. In the defense's summary judgment, the entire falsified deposition was used as material fact when the accuracy and the validity of the written deposition was in question and never properly verified. For that reason, summary judgment should be reversed. May I ask you a question about your case on the summary judgment, Ms. Reed? Yes. You're complaining in your race discrimination claim, my understanding is you're complaining that you were sent to a family who specifically requested a black nurse, is that right? Yes, I was. Okay, and you complained about that to Pediatric Services, is that right? That's correct. What happened to you? What was the bad thing that happened to you as a result of your complaint? Basically, they left me in the situation. The daughter was very abusive. She was very hard to handle. I felt that they particularly picked black nurses to go there. I'm not even really sure what the reasoning behind that was. The family was Caucasian, but she requested black-only nurses. The daughter was very difficult, as I said. When I complained, I didn't think that it was fair that only black nurses were being sent there to have to deal with the behaviors. I got no real resolve, so I went to corporate and made a complaint with first the President of Vice People Services, and then I went again and had another complaint with Assistant Vice President of People Services. Can I ask you a question about your complaint? You complained about the request for only black nurses, right? I was very – yeah, I was very – Okay. No, so you complained before the job started about that, or – When she first stated that she wanted – she had a client that wanted black-only nurses, I didn't even take that as real, because I kind of laughed, because I'd never heard that before, that she had a Caucasian client that only wants black nurses. So I kind of thought she was joking around with me, but to come to find out, she was not. And when I got there and I met the daughter and I met the family, it was a reason why other ethnicities probably didn't want to go there. So when you escalated your complaint up the management chain, was it after the job had started, after you'd met the daughter? It was after I had already met the daughter and the mom. Yes, I did take it to the President of People Services at that time. And what response did you get then? Basically, he was just trying to smooth it out. They never took me off the case.  I sent pictures of the bruises and the scratches and the pulling of the hair and ripping out my earrings, being beat up, pretty much going to work, being attacked by this daughter. Constantly, I was constantly in contact with the office, sending them pictures of whatever day I had, most likely being abused by the daughter. And they were very much aware of what I was going through at the home. Thank you very much. Ms. Freed. I'm sorry. Go ahead, Judge Carnes. I'm sorry. Ms. Freed, I have a question for you. But is your complaint that they sent you there originally, or is your complaint that when you complained to them about sending you there, they did something to you? They basically were giving me the ultimatum of going there or going nowhere. I've been working with the company for three years at that time. All right. So then we're ordering you to go there. Yes, sir. That's your complaint. Right. And you didn't go there. You resigned, didn't you? I did go there simply because they weren't giving me any other cases. They were not working me, and I needed to work. So I did go there. I did try it, and it was not bearable. That's why I kept going to the corporate office complaining. And then what are you complaining to us about that they ultimately did to you or didn't do for you? Well, when I went to the corporate office, I spoke with Assistant Vice President of People's Services, and she stated to me, A case was offered and accepted where you were told the mother requested a black nurse to care for her child. Due to the nature of our business arrangement, a family can insist on a certain demographic, and we do honor those requests as services are provided in their own residence. This arrangement that they have with their clients violates the plaintiff's civil rights under Title VII of the Civil Rights Act of 1964. They cannot choose me because I'm black. Thank you. Yes, sir. Thank you, ma'am. We'll give you five minutes to respond to the other side. So if you want to take your seat now, and then you can come back up. Sure. Thank you, Your Honor. Erica Hashimoto is court-appointed amicus from the Georgetown Law Center. And with the court's permission, third-year law student Hannah Nguyen will be presenting for amicus. Yes, ma'am. Welcome, Ms. Nguyen. Thank you. May it please the court. In response to this court's appointment order, amicus takes the position that Ms. Reed properly preserved her objection to the accuracy of her deposition transcript and that neither the magistrate judge nor the district court judge could properly resolve that objection without first conducting an evidentiary hearing. Furthermore, remand is independently warranted because the district court failed to consider crucial evidence supporting Ms. Reed's race discrimination claim, namely the letter that Ms. Reed just mentioned in which PSA admitted to a race-based assignment. First, with respect to the preservation issue, Ms. Reed's original motion challenging the transcript promptly put the district court and PSA on notice of the nature and extent of her objections to the transcript. In attempting to resolve those objections, the magistrate judge issued an order that held that the court, quote, declines to find the transcript of her deposition to be inadmissible. On its face, that order made no determination that the transcript was accurate as a matter of fact and unimpeachable in future proceedings. The final R&R was the first instance where the court made that explicit holding. Can I ask you a question about that? Just in reading the magistrate judge's order, R&R, denying Reed's challenge to the admissibility of the transcript because it found no merit to her claim that the transcript was inaccurate, why is the admissibility and accuracy, why are those two separate analyses, why are they not all rolled up into one? Respectfully, Your Honor, that's not quite what the order said because it only said that it rejected her assertions. It didn't specifically invoke the term accuracy and nothing in that order that purported to only resolve evidentiary admissibility could have alerted Ms. Reed to the legal technical implication that any challenges to the deposition's accuracy were forever foreclosed after that ruling. And the reason why is because a ruling on admissibility in general does not foreclose a litigant from being able to attack that piece of evidence on other grounds or seek to undermine its probative value. And so as a pro se litigant in particular, if the legal effect of a ruling on admissibility was that no later challenges to accuracy could be brought, there needed to be more to that order to alert her to that effect. And PSA's own willingness to litigate the dispute as to the transcript in this court shows that not only was it unclear to a pro se litigant, but even a counseled attorney may have been reasonable in relying on the text of the order itself, which reported to only resolve admissibility. If we move forward to the district court order, it seems to me that the district court considered on the merits the issue of the accuracy of the transcript because the district court noted what the magistrate judge had said and said that was correct. And said that that was correct. So can't we review the merits determination by the district court? That is correct, Your Honor. And precisely because the district court did conduct or did opine on the merits of the magistrate judge's original ruling, there's no concern that this would somehow deprive the district court judge of an opportunity for review. And as Ms. Reed pointed out, the very fact that the district court judge in the final order recognized her objections and in our position erroneously agreed with the magistrate judge on the merits is precisely why that objection should be found to be preserved on appeal. Let me ask you a question about your claiming error in what the district court ruled. And you've asked that we send it back and either direct the district court to have an evidentiary hearing or that the district court should have listened to the tape. If we agree with you, how do we avoid a situation where we're adopting a de facto the district court has to listen to the entire deposition tape every time someone complains about it and its accuracy rules? I mean, we all know there are depositions that go on for a long period of time, particularly if they're not bound by any state rule or the parties have agreed. How do we avoid crafting a rule that this has to happen in every circumstance? Well, first, to address the court's concern, I would just point out that this is a very unusual circumstance, and in the vast majority of cases, the errata sheet process that PSA refers to in its response will be the appropriate mechanism for challenging deposition transcripts where there are discrete and identifiable errors. But that was just not the process that was feasible to misread given the extent of her objections and given that she never had access to the audio recording. Counsel, let's rephrase the question then. What's to keep this from becoming the usual practice in pro se litigants? Because if and when the magistrate judge or the district court does conduct an evidentiary hearing and determines on that review that there is no merit to their objections or that their objections are ostensibly brought not in good faith, the pro se litigant or any litigant would suffer the consequences of potentially an adverse ruling against them on the evidentiary issue or possible sanctions or perhaps the consequences attendant to swearing those assertions under the penalty of perjury. This is a rather awkward situation because you're not representing Ms. Reed. You're a friend of the court. But it seems to me like that wouldn't be your argument if you were representing Ms. Reed because it exposes her to a possible prosecution for perjury or to sanctions at the very least. Do you have any qualms about that? We do not take a position on what steps the district court should take when it conducts an evidentiary hearing. I understand that. But you're saying don't worry about this becoming the routine claim and allegation in tactic in pro se cases because you can always prosecute them for perjury or sanction them. It is assumed that when a litigant swears something under penalty of perjury that carries certain meaning and would discourage litigants from bringing these objections unless they were brought in good faith. And we're not in a position to make that determination now. But as I mentioned earlier, there would be no temptation to bring these assertions in bad faith because at best they would get an adverse ruling against them on the evidentiary issue and at worst, as Your Honor pointed out, potential sanctions or criminal liability. You've had a different experience. And I'm not speaking about Ms. Reed specifically at all. But you've had a different experience with pro se litigants than some of us on the bench have. Some folks just think the longer they can keep the case going, the more hope they have about it. And some folks will be more than happy to say what is necessary to keep it going under penalty of perjury. Others won't. And I'm not implying that Ms. Reed falls in that former category. But that's a decision. That's a factor that we have to consider in considering the remedy where we have this decision. Let me ask you this. Judge Branch has mentioned sometimes depositions go on for days. And those cases are in this one. Could we have, would it be enough if the district court or the magistrate judge, to whomever the task would fall, samples, let's say, a dozen of the instances in which the litigant says, this says I said yes, what I said was no. Or this says X, and I didn't say X at all. Would it be enough if the magistrate judge took the 10 greatest hits in the allegations and listened to those as opposed to the 2,094 total? Your Honor, that would depend on whether or not that mechanism of resolution would resolve competing sworn statements. If after conducting that review, both parties are satisfied with the ultimate transcript and the court's review, then it would be enough. Counsel, both sides are not going to be satisfied with it. The pro se litigant is going to allege, no, you've got to, even if I made a mistake on those dozen, you've got to examine all of them because you used and relied on all of them. So what I'm trying to find out is what remedy you want us to impose on district courts when this kind of allegation is made. When there are sworn competing written statements, the remedy must be that the district court resolves those in a way that comports with the tenets of summary judgment. And here, that would require more extensive review and inquiry to the extent that those disputes exist. And if there are no further questions, we ask that this court reverse and remand. Thank you. Mr. Schultz. May it please the court, my name is Chad Schultz. I represent Pediatric Services. This case is a great reminder or example of the importance of the rules. Specifically, Rules 72, Rule 30E and F, and the local Rules 56.1. And I will get to those and the significance of those, but it's a reminder that those rules are there for litigants to have an efficient way to resolve issues like we have here today. The plaintiff chose to proceed pro se, which means that we would liberally construe her pleadings, but she still must comply with the rules, and I think that that is a consistent ruling in the Eleventh Circuit. The defendant, my client, took plaintiff's deposition. It was all done pursuant to the rules. It was certified by a court reporter, which the rules actually refer to as an officer, and that is under Rule 30F, where it specifically talks about the duties of the officer, that is, the court reporter. The transcript was delivered. It included an errata sheet. Rule 30E sets out clearly that the deponent has 30 days, if they wish, to identify on an errata sheet where they have an issue with the transcript's accuracy. How would that work in this case? If she's saying that there are parts of her testimony that were omitted, how do you fill out an errata sheet like that? An errata sheet, in my experience, is, you know, I said he, the court reporter typed she, or you misspelled this company name on this page. This is an unusual circumstance, challenging that the transcript is inaccurate to a large degree. How would an errata sheet function under that sort of challenge? Under an errata sheet, what the plaintiff could have done and should have done was gotten a copy of the tape, which she could have. She could have compared that to the transcript and then write down where the tape, which is actually what was said, differs from the transcript. I don't think it's any different than a simple, I said yes and it should have been no. It would have taken more sheets, perhaps, on the errata, but that's the process that we've developed. It's Rule 30E. It's made so that we don't have issues like this. Otherwise, every single time you would have a, whether it's pro se or not, a deponent come in and say, yeah, that's not what I said. Generally, that's not what I said. Let me stop you. You just said something that caught my attention. She could have gotten a copy of the tape. We're up here at the 11th Circuit. You've gone through a magistrate judge, you've gone through a district court, and we're now at the 11th Circuit. Did anybody ever suggest give her a copy of the tape and let her assure herself that this is an accurate transcript? Do you mean by that, did I call her and ask her to? No, at any point in time, you've been in court, in court proceedings. Did anybody suggest at any point, why are we not just giving her a copy of the tape? No, but, I mean, Rule 30E allows you that opportunity. That's why I'm saying it's set up in the rules. Now, she didn't pay for a transcript. The court reporter just gave her one when she went there. If she would have asked for a copy of the tape, I don't see any reason why they wouldn't have made that available also. She had that opportunity. No, I'm just saying that it seems like that suggestion could have been made much earlier than now. By the court, you mean? By anybody along the way. By you, by the magistrate judge, by the district court, by Ms. Reed, certainly. I don't believe that anybody on my team ever called her and said, hey, you should ask for a copy of the tape. I would agree with that, Your Honor. Have you obtained a copy of the tape? No, I have not. So, what happened when she got the transcript, she filed the motion with the court. And we, as a decision, decided we should use, again, a neutral party, contacted the court reporter company and said, look, we've got this challenge to the transcript. Not just a couple of phrases, but they're saying that your court reporter added things, took things out, made things up, changed everything on there. And a manager there at the court reporter company sat down and listened to the entire six hours, compared it word for word, and signed another declaration. Again, putting his license on the line, not only 30-F, but also that he did a sworn declaration where he says that what is on the audio recording is word for word what's in the transcript. Can I ask you two questions about that? Sure. Is his declaration, that second one, is that sworn? Yes, as I understand. Now, I would have to go back and look at it, but my understanding was that that was a sworn declaration. I didn't think it was. So, I'll have to go back and check as well. But you also said a neutral party, but this is coming out of a court reporter. You've called her court reporting services company. Let's just assume for the sake of argument, everything that Ms. Reed has said is correct. This is a pretty significant allegation against the court reporter and, as a result, the court reporting company. I guess I'm struggling to see how getting a manager at the court reporting company is, in fact, a neutral party. Well, I understand what you're saying about neutral party, but that company has a lot to lose. If they actually not only had a court reporter who completely made things up and changed it, but then they came into court and signed a declaration saying, no, I went back and checked and everything's right, it may not have been a neutral party, but it's certainly a party who had a big stake in the accuracy and had no reason at all to confirm misrepresentations. In fact, the motivation for the manager would be, make darn sure that if you're going to make a representation that it's accurate, that it absolutely is. And under the rules, we put a lot of pressure on court reporters to do things absolutely accurately. And there has to be some presumption in evidence that once under Rule 30F they have complied with the rule and they've sworn that the way they took it down is exactly what was said, there should be a presumption that what they're saying there is accurate. And if it's not accurate, the whole system falls apart. Well, I would agree with you that there is certainly a presumption, but we have a sworn declaration on the part of Ms. Reed. So she's certainly put this into question. And quite frankly, I mean, I've never seen a challenge to a deposition transcript before to this magnitude. I mean, it certainly captures one's attention. You're right. I've never seen that either. Mr. Schultz, the factors you're mentioning about what kind of interest the manager had, it seems to me that that goes to the credibility of the person giving the declaration, isn't it? I mean, that person would have to be credible, absolutely. I think we were saying, are they neutral? I said, no, they're not neutral, but they're certainly motivated to be accurate for the same reasons that you're saying they're not neutral, I guess, because he is associated with the same court reporting company. So did the court here make credibility determinations without viewing any evidence? No, the court made evidentiary decisions, not credibility. What the court was looking at is, is the tape that we have, so we know exactly what was said, is the tape, if you compare that with the transcript, is it the same? The court reporter was not coming in and saying, well, what the plaintiff is saying isn't true because I was there and I know that's what was said. No, we actually have the tape. So it wasn't a credibility decision of one person saying the light was red and another one saying the light was green. We actually have evidence that the court has to say the light was green, and that was through this declaration by the court reporter, the certification by the court reporter, and a declaration by the court reporter manager. So it was not that the court made a credibility decision between two parties. It was an evidentiary decision, and the evidence on one side, what the defendant had, and then you look at what the plaintiff had, and all the plaintiff had was, yeah, I don't think I said that, and that's all the plaintiff had. So the court did look at the evidence and concluded that the evidence weighed in favor of the admissibility of the deposition transcript. Well, actually, the plaintiff didn't say, well, I don't think I said that. She said I didn't say it under penalty of perjury. The sworn statement, just like the court reporter's manager's statement was sworn. Of course, what hasn't been said is you give the pro se litigants in this situation an opportunity to and the right to demand that some judge sit down and listen to the entire tape and compare it to the record, I mean, compare it to the deposition. Then the next question is, well, what if the pro se litigant comes in with a sworn affidavit and says the tape's been doctored? I heard that, but that's not what I said. Here's my sworn declaration, have an evidentiary hearing on whether the tape has been doctored. Which is exactly why we have the Rule 30E, and we use the errata sheet, because at least then the court would know exactly what phrases the plaintiff believes are not accurately reported Counsel, I thought in this case she had marked up the deposition to indicate which one she thought was not accurate. I'm not talking about in the formal errata sheet manner, but had submitted something that showed what she thought was inaccurate. Am I wrong? That is correct. I'm just saying she did not use the errata sheet and the process that was in 30E. If we can, if I can talk for a moment about Rule 72, and that is one of the issues here is whether the plaintiff preserved this objection to be heard by the court here, because she did not ever file any kind of an appeal of the magistrate's original opinion saying that the transcript was going to be admissible. Our position is that Rule 72 is clear, one must object, and in this case the plaintiff did not. So it should be that this matter should be what was not preserved and is not a proper issue for this court. What about the fact that the district court actually considered the merits of this deposition transcript issue after it was raised in an objection to the final recommendation? You're saying in the final district opinion where the court is saying that that issue has already been resolved? The district court considered the issue. So why doesn't that make it so that it's preserved for our review? I understand that position, and I think the court was just commenting that it had already been a matter that had been ruled on by the magistrate, and although the district court did not say that it was an appeal and therefore not an issue for that court, that court did comment that the issue had already been resolved. But even under that, even if that were not the issue, the district court did properly analyze the matter and did rule that the transcript was going to be admissible. The other rules that I think that I wanted to point out is the local rules on summary judgment need to be followed on the statement of material facts and responses to the statement of material facts, etc. The court ruled that the statement of material facts that had been presented by the defendant would be the one that the court would apply because the defendant had put forth evidence to support each of those and rejected the objections that were made not pursuant to the rules by the plaintiff. But didn't the defendant's statement of material facts rely heavily upon the plaintiff's deposition? It did, and it needs to. I mean, our entire litigation judicial system is built on being able to rely upon what you discover, including depositions. And the court had already ruled that that deposition was admissible. So yes, the statement of material facts significantly relied upon the plaintiff's admissions in a deposition. And the court ruled that those statements of material facts had basically not been properly objected to, and the court adopted them. They looked and said there was support for each of those. But if we were to send this back and the court were to conclude that Ms. Reed was right, that the transcript was inaccurate, then that would undermine the statement of material facts significantly, right? Well, I guess if a court came back and said that the transcript wasn't accurate, yeah, of course. So you're not arguing that the statement of material facts independently supported ruling in your favor? Well, I'm starting out with the statement that the transcript was accurate. And I know that there's the issue that the plaintiff has brought up, but there's the evidence shows overwhelmingly that the deposition transcript accurately reflects what was said in her deposition. The court ruled primarily on the issues of discrimination and retaliation that there had been no adverse employment action, that the company repeatedly made options available for the plaintiff to work for different clients, and the plaintiff repeatedly refused those. The plaintiff admitted that she was not fired, and the court said it was really the opposite of adverse employment action because the company had gone out of its way to make opportunities available for the plaintiff to work as much as she wanted to work, and she basically was the one who chose not to accept any of those. In our case of Farrell, we said that assigning employees to job responsibilities by race constituted direct evidence of discrimination. So why in this case was it not direct evidence of discrimination for the company to have assigned her a job as a nurse based solely on the fact that she was black and the family had requested a black nurse? Your Honor, they had repeatedly offered her other opportunities, and the court ruled on a motion for summary judgment based on, again, going back to the rules, the statements of material facts and what the court relied upon based on the evidence before it. We now have on appeal a plaintiff coming in and, again, asking this court to go outside of the evidence that the trial court used in making its determination. And based on the evidence that the trial court used, the court concluded that there was no evidence of discrimination and no evidence of retaliation because the plaintiff could not meet her burden under the evidence before the court. And the time to bring evidence is at the trial court and had an opportunity, again, under those local rules, 56.1, there's a specific procedure as to what evidence gets presented to the court on motions and what evidence doesn't. And the plaintiff is attempting now to sort of sidestep that and come in from the side and ask this court to consider evidence that the trial court did not consider. In conclusion, the plaintiff filed this pro se. It was dismissed because it lacked merit. There's no evidence that her deposition that the transcript is inaccurate, other than her statement that there are things in there that I didn't say, etc., etc. But we have plenty of evidence to show that what she said is accurately represented in the transcript. The plaintiff has not been treated unfairly by this process in any way. This is not a situation where a defendant says, you know, under the rules it's a gotcha situation. The plaintiff had a full opportunity to litigate her case. She lost or the defendant was successful with their summary judgment ruling. It was the right ruling, and we respectfully request that this court affirm that ruling. Thank you. Thank you. Ms. Reed, would you like to make your concluding remarks? I'd just speak regarding to the summary judgment. In the defense's summary judgment, the entire falsified deposition was used as material fact. When the accuracy and the validity of the written deposition was in question and never properly verified. For that reason, judgment should be reversed. I do not feel that the deposition was properly verified because the tapes were never heard. There's no way that Judge Johnson could even compare the two tapes that he hadn't heard. He reads the written report but hadn't heard the audio report. I was there. The court reporter was there and one of your colleagues were there. We're the only three that knows what was said. I know what I said. There's no way that I would read that report, see all of these discrepancies, and just let it go. I couldn't not do that. There was multiple discrepancies. It was not just he or turned into she or small little things. These were gross inaccuracies. Ms. Reed, if I may ask while you're describing the gross inaccuracies, give us an example of the worst one. Or one of the worst ones. It was stated in the report that I did not mind being called a nigger as long as the person didn't say it to my face. That sounds like a 12-year-old child. I don't even speak like that. It was about one of the parents that used to say that word a lot in his home, and I called them and reported that. They said that they were very much aware that he does that, but he is in his home. That was another thing, that he was allowed to say what he wanted in his home. Give us another example. There's many. I just wasn't prepared for the question. But about the me having no issue with the mom of the parent that wanted the black nurse, she said a lot of things that were really out of order as far as kind of on the racial side. And that's not in the written deposition when I told them the things that she would say in the house. So I had apparently misunderstood it. I thought your, not that this matters, but just so I'll understand the specifics. I thought that your complaint was they had things attributed to you that you did not say. But I just heard you say, I think, that there were also things you said that aren't in the deposition. Is that correct? There were omissions. There were things that were added. And there were things that I just didn't say. Throughout the deposition. Yes, sir. A lot. Lots of it. A lot of it. I mean, a lot. Let me ask you this. There's no way that anyone could read the written deposition and listen to the audio and not see those discrepancies. They are gross discrepancies. All right. Let me ask you this. And I'm not saying that this matters to the result or certainly to the law. But do you have any idea why this court reporter and her supervisor would basically lie in their certifications about what you said or didn't say? I don't have any idea on why they would do that simply because that would be something that they decided to do together. But what I do feel is that they never thought that I would actually ever get the report. When I went to. They couldn't. They couldn't counsel. I'm sorry, Miss Reed. They couldn't have thought that because every court reporter and every court reporter supervisor knows that the depositions have to be made available to the parties. Yes. They may have to pay for them or they may not. But in this instance, as I understand your opposing counsel to have said that you were furnished with a written copy of the deposition, which is all we have, a copy of the deposition without charge by the court reporter, which is an unusual thing for someone who had falsified a deposition to do. I'll explain that. I asked for a written, a copy of the written deposition. I was told that it would run me around $300. After we had the deposition, we were sitting around. I was talking with the court reporter and I asked her at that time, how much do you think this would run me? And she told me around $300. When I got an invoice, she sent me an invoice of $1,500. I was not working. I had no income. There was no way that I would be able to pay for a $1,500 deposition. So I went to the sister building and I told them that I needed to just be able to see it. I never knew that they were going to give me a copy. I just said I had a right to see it. So what happened was, because of all of the COVID stuff that was going on, he left me at the door. He came back and he said, listen, I can't allow you to come in here and look at the deposition or go through it. But what I'm going to do for you and for your records, I will give you a copy. No, the defense nor the court reporter, because had any knowledge that I would get a free one, I didn't even know I would get a free one. He came back to the door. He handed me the deposition. He told me he only did that because they were under COVID precautions and I could not come in and do any alterations. He would give me the copy for my records. Thank you, Ms. Reed. I understand. I appreciate the explanation. Thank you. The court understands your arguments. Let me express my appreciation to Ms. Hashimoto, Ms. Nguyen, and everybody from the Georgetown University Law Center who assisted the court with this case. You have very ably discharged your obligations and we do appreciate it. Thank you. Court is adjourned until 9 a.m. tomorrow morning.